James **MILLER**, Plaintiff,

v.

Phillip **BERMAN** & The Multihull Company, Inc., Defendants.

No. 6:03–CV–293–Orl–28KRS.

United States District Court, M.D. Florida, Orlando Division.

July 23, 2003.

---

Merrill G. Davidoff, Shanon J. Carson, Berger & Montague, P.C., Philadelphia, PA, Paul Scheck, Kathleen Krak, Shutts & Bowen, LLP, Orlando, FL, for Defendants.

Robert F. Spohrer, Spohrer, Wilner, Maxwell & Matthews, P.A., Jacksonville, FL, for Plaintiff.

## ORDER

ANTOON, District Judge.

This case involves the purchase of a highly customized catamaran sailboat in

South Africa. Plaintiff James Miller ("Mr. Miller") has filed a four-count complaint against Defendants Phillip Berman ("Mr. Berman") and The MultiHull Company, Inc. ("TMC") (collectively "Defendants") alleging negligent misrepresentation, breach of express warranty, false advertising and joint venture liability. Defendants have moved to dismiss the complaint for lack of personal jurisdiction and improper venue pursuant to Federal Rule of Civil Procedure 12(b)(2) and (3) or, in the alternative, to transfer the case pursuant to 28 U.S.C. § 1406(a). In accordance with *Venetian Salami Co. v. J.S. Parthenais,* 554 So.2d 499 (Fla.1989), a limited evidentiary hearing was held before this Court on June 30, 2003 in order to resolve the factual issues relating to jurisdiction and venue. Upon consideration of the parties' submissions and oral argument, the Court shall grant Defendants' motion to dismiss for lack of personal jurisdiction and transfer this case to an appropriate venue.

## I. *Factual Background*

Mr. Berman is the President of TMC, a corporation organized under the laws of the State of Ohio with its principal place of business in Montgomery County, Pennsylvania. (Doc. 6 at 2). TMC is a broker for new and used multihull catamarans and markets its brokering services via internationally-read trade magazines and an Internet website that it maintains in Pennsylvania. TMC does not regularly conduct business in the State of Florida. In fact, Mr. Berman does not hold a Florida Yacht Brokers License, and thus cannot directly broker the sale of used yachts in Florida. However, Mr. Berman does attend a boat show in Miami at least once a year.

On September 25, 2001, TMC entered into an agreement with Cougar Marine CC ("Cougar Marine"), a South African yacht builder located in Durban, South Africa. Under the agreement, TMC agreed to become the sole North American distributor of the F–41 Catamaran. As the exclusive distributor of the F–41 Catamaran, Defendants would advertise Cougar Marine's product in trade magazines and on TMC's website for a commission on the sale of a Cougar Marine boat.

On February 27, 2002, Mr. Miller sent Defendants an unsolicited e-mail expressing an interest in purchasing a used catamaran sailboat. Mr. Miller expressed a particular interest in the F–41 Catamaran built by Cougar Marine. After an exchange of several e-mails and telephone conversations, it became clear to Defendants that Mr. Miller was a professional boat builder seeking to purchase an extensively customized sailboat that was significantly different from the standard F–41 Catamaran constructed by Cougar Marine and advertised by Defendants. (Pl's Ex. 5 at 3). As a result, Mr. Berman explained to Mr. Miller that TMC could not negotiate such a customized deal, but advised Mr. Miller to consult with Jim Morrow ("Mr. Morrow"), President of Cougar Marine, to determine whether Mr. Morrow could build a catamaran according to Mr. Miller's highly customized specifications (Decl. of Mr. Berman, Doc. 5 at ¶ 9). During these initial communications with Defendants, Mr. Miller was a resident of the State of Florida.

Over the past twenty years, Mr. Miller, an engineer, has been actively involved in the boat making industry. For example, Mr. Miller has spent approximately ten years as a sail maker and has also spent a substantial part of his career involved in building molds and working on the internal systems of boats, including engine installation, electrical wiring and plumbing. Mr. Miller has built dagger boards and center boards and has built an entire tooling for a

thirty-two foot catamaran including cross arms, hulls, and decks. Additionally, Mr. Miller is an avid sailor and concedes that he has sailed most of his life.[1] In sum, Mr. Miller has extensive knowledge with regard to the intricacies of boat making and is a sophisticated sailor.

On May 8, 2002, Mr. Miller traveled to South Africa to meet with Mr. Morrow and discuss the purchase of a customized Cougar Marine boat. While in South Africa, Mr. Miller toured the Cougar Marine factory and met with Mr. Morrow. Based upon Mr. Miller's experience in South Africa and his expertise in the boat industry, Mr. Miller engaged in negotiations with Mr. Morrow regarding the customized sailboat. After extensive negotiations with Mr. Morrow, Mr. Miller drafted in part and signed a contract for the purchase of a highly customized catamaran to be built by Cougar Marine for $297,000.[2]

There were many special features that Mr. Miller insisted be included in the design and manufacture of his boat. For instance, Mr. Miller contracted for an epoxy boat that was spray-painted, rather than the balsa core boat initially advertised by TMC.[3] He also requested a 44–foot boat rather than the 41–foot boat originally offered by Cougar Marine. In addition, Mr. Miller wanted customized dag-gerboards built to his own design and also insisted on designing the extended stems of the sailboat. Last, Mr. Miller wanted his boat to be "CE certified," a European classification.[4] Overall, the catamaran sailboat Mr. Miller agreed to buy from Mr. Morrow was significantly different from the catamaran sailboat advertised by TMC on behalf of Cougar Marine.

Defendants were not present and did not participate in the negotiations preceding the contract between Mr. Miller and Mr. Morrow. Also, Defendants are not in any way a party to the purchase agreement. In fact, while Mr. Miller was negotiating the contract with Mr. Morrow in South Africa, Mr. Berman was traveling in France and was unavailable for discussion regarding the conditions of the contract and the purchase of the customized catamaran. (Def.'s Ex. 6). In sum, Defendants' participation in the transaction merely involved introducing Mr. Miller to Mr. Morrow and accepting a fifteen percent commission on the sale of the Cougar Marine catamaran sailboat.

Soon after the signing of the purchase agreement with Cougar Marine, Mr. Miller and his family relocated to South Africa in order to oversee the construction of the boat. During that time, a number of formal and informal sub-agreements were

---

1. During the evidentiary hearing Mr. Miller provided the Court with an extensive description of his long and successful career in the boat industry.

2. TMC was paid a commission on the sale of the Cougar Marine catamaran to Mr. Miller based upon Cougar Marine's separate distribution agreement with TMC.

3. "An epoxy spray-painted finish is substantially more costly than the gelcoat finish which TMC advertised on its website, and requires that the boat be cured during production in a large, customized enclosure where extremely high heat is applied to the boat. Epoxy spray painted finishes are gener-ally unavailable in production manufactured boats such as the Cougar Cat that TMC advertised. Cougar Marine was never equipped to manufacture an epoxy boat, and the factory tooling had to be modified to complete Mr. Miller's boat." (Decl. of Naidu, Doc. 30, Ex. 3 ¶ 13–14).

4. "Gaining CE certification-a European classification-is a costly and time consuming process involving achieving compliance with European rules and regulations, and verification of such compliance by European authorities. The production Cougar 41 that TMC marketed was not a CE certified boat." (Naidu Decl. ¶ 17).

made between Mr. Morrow and Mr. Miller with regard to the construction of the catamaran. Defendants were not a party and had no further knowledge of these additional sub-agreements. On September 12, 2002, a fire occurred in the Cougar Marine factory which resulted in the end of construction of Mr. Miller's catamaran and the rapid demise of the business relationship between Mr. Miller and Mr. Morrow.

In late October, Mr. Miller wanted to rescind his contract with Cougar Marine and requested the return of approximately $103,950 that he had already paid as a deposit and in progress payments for the construction of his boat. (Naidu Decl., at 3). At that juncture, Mr. Berman served somewhat as an intermediary between the parties and made efforts to repair their relationship. This is evident upon reading the exchange of e-mails between Mr. Miller and Mr. Berman. For example, on December 4, 2002, Mr. Berman expressed the following to Mr. Miller:

> The facts of this matter, particularly regarding your dispute with Cougar, are not clear to me at all, *as I am not aware of the agreements you struck with Cougar.* At this point, I only know there is a serious problem that must be resolved in a manner that is just and fair to all
> . . . .

(Ex. 5) (emphasis added). The e-mail communications on the record show Mr. Berman's efforts to repair Mr. Miller and Mr. Morrow's business relationship and also elucidates the fact that Defendants were not privy to the intricacies of the purchase agreement entered into by Mr. Miller and Cougar Marine. Although Mr. Miller and Mr. Morrow attempted to renegotiate the contract, they were unable to reach an agreement.

Currently, Mr. Miller and his family reside in South Africa and have lived there for approximately eight months. In fact, Mr. Miller purchased a home and has paid taxes associated with owning a residence in South Africa. Also, Mr. Miller's children are currently obtaining an education in South Africa. Mr. Miller no longer owns property in the State of Florida. Although Mr. Miller claims Florida as his place of residency, upon leaving South African he plans to engage in a physical rehabilitation program in Europe.

## II. *Legal Analysis*

When deciding whether a Florida court has personal jurisdiction over a nonresident two inquiries must be made:

> First, the complaint must allege sufficient facts to bring the action within the ambit of one of the various jurisdictional criteria contained in Florida's long-arm statute found in section 48.193, Florida Statutes (2000). Second, if the complaint properly alleges long-arm jurisdiction, sufficient minimum contacts must be demonstrated that satisfy the requirements of federal due process.

*Northwestern Aircraft Capital Corp. v. Stewart*, 842 So.2d 190, 193 (Fla. 5th DCA 2003) (quoting *Law Offices of Sybil Shainwald v. Barro*, 817 So.2d 873, 875–76 (Fla. 5th DCA 2002)); *see also Venetian Salami Co. v. Parthenais*, 554 So.2d 499 (Fla. 1989). "Resolution of the first issue requires statutory analysis of Florida's long-arm statute found in section 48.193, Florida Statutes, which bestows broad jurisdiction on Florida courts. . . . Section 48.193 provides two categories of personal jurisdiction: specific jurisdiction, conferred under section 48.193(1), and general jurisdiction, conferred under section 48.193(2)." *Northwestern Aircraft Capital Corp.*, 842 So.2d at 193 (citing *Christus St. Joseph's Health Sys. v. Witt Biomedical Corp.*, 805 So.2d 1050 (Fla. 5th DCA 2002)).[5] "The

---

**5.** Plaintiff's response to Defendants' motion to dismiss alleges that "[t]he substantial nature

second issue involves constitutional analysis which is controlled by United States Supreme Court precedent interpreting the Due Process Clause. This analysis imposes a more restrictive requirement than the statutory analysis." *Id.*

A. *Defendants' conduct does not give rise to personal jurisdiction under Florida's long-arm statute.*

Mr. Miller argues that the allegations in the complaint are sufficient to assert specific jurisdiction over Defendants under sections 48.193(1)(a), (1)(b) and (1)(f), which provide:

(1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:

(a) Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.

(b) Committing a tortious act within this state.

. . . .

(f) Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either:

(1) The defendant was engaged in solicitation or service activities within this state;

(2) Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

§ 48.193, Fla. Stat. However, none of these bases for specific jurisdiction are supported in this case.

■ First, Defendants cannot be subject to personal jurisdiction pursuant to Section 48.193(1)(a) because Defendants do not operate, conduct, engage in, or carry on a business or business venture in the State of Florida, nor do Defendants have an office or agency in this state. TMC is organized under the laws of the State of Ohio, with its principal place of business in Montgomery County, Pennsylvania. In addition, TMC does not regularly conduct business in the State of Florida. In fact, Mr. Berman does not even hold a Florida Yacht Brokers License, and thus cannot directly broker the sale of used yachts in the State of Florida.

Although Mr. Miller suggests that Defendants' Internet website is a means of conducting or carrying on business in the state of Florida, Defendants never solicited business or contracted with Florida residents over the Internet to warrant personal jurisdiction. *Cf. Obermaier v. Kenneth Copeland Evangelistic Assoc., Inc.,* 208 F.Supp.2d 1288, 1291 (M.D.Fla.2002) (holding that Texas-based organization was subject to specific personal jurisdiction in Florida even though it did not maintain office or have any employees or agents in Florida on a regular basis; personal jurisdiction was ultimately exerted because organization *solicited* contributions from

of Defendants' contacts and communications with Plaintiff while he was a resident of Florida give rise both to personal [sic] and specific jurisdiction." (Doc. 16 at 2). It is unclear whether Plaintiff is relying on both categories

of personal jurisdiction in his arguments in support of asserting jurisdiction. As a result, the Court will address both categories of personal jurisdiction in its legal analysis.

Florida residents using local television stations and Internet websites). Therefore, the Court concludes that there is no specific jurisdiction over Defendants under Section 48.193(1)(a).

Second, Mr. Miller asserts that specific jurisdiction over Defendants is proper under Section 48.193(1)(b), which confers personal jurisdiction over parties who commit a "tortious act" in the State of Florida. Specifically, Mr. Miller alleges that Defendants should be held liable for the torts of negligent misrepresentation, false advertising and breach of express warranty. Mr. Miller alleges that access to TMC's website from Florida and the electronic communications exchanged with Mr. Berman while Mr. Miller resided in Florida are sufficient to assert jurisdiction over Defendants. In support of his position, Mr. Miller relies upon *Wendt v. Horowitz*, 822 So.2d 1252 (Fla.2002), a Florida Supreme Court opinion which held that " 'committing a tortious act' in Florida under section 48.193(1)(b) can occur through the nonresident defendants' telephonic, electronic, or written communications into Florida." *Wendt*, 822 So.2d at 1260. The Court in *Wendt* also explained that in order to subject Defendants to personal jurisdiction under these circumstances the cause of action must arise from the communications. *Id.*

■ "First, in order to 'commit a tortious act' in Florida, a defendant's physical presence is not required. Second, 'committing a tortious act' in Florida under section 48.193(1)(b) can occur through the nonresident defendant's telephonic, electronic, or written communications into Florida." *Wendt*, 822 So.2d at 1260. However, as Defendants explain, "*Wendt* stands for the proposition that an e-mail or telephone communication from out of state can support personal jurisdiction under the Florida long-arm statute only if the cause of action arises from the communications." (Doc. 23 at 5). Mr. Miller's access to TMC's informational website and subsequent exchange of e-mails with Mr. Berman does not constitute a tortious act in the state of Florida because the cause of action here arises out of the contract Mr. Miller entered into with Cougar Marine. Defendants are not a party to the agreement and were not involved in the drafting of that agreement or any other sub-agreement entered into by Mr. Miller and Mr. Morrow.

The electronic communications on the record are telling of the limited role Defendants played in the negotiations and terms of this transaction.[6] The communications between Mr. Miller and Mr. Berman ultimately resulted in TMC merely recommending that Mr. Miller, a sophisticated boat maker and sailor, visit the Cougar Marine facility in South Africa. Upon arriving in South Africa, visiting with Mr. Morrow, and inspecting the Cougar Marine factory, Mr. Miller independently negotiated and entered into a contract with Cougar Marine. In fact, Mr. Miller has conceded that Mr. Berman did not participate in any manner whatsoever in the negotiations preceding or after the signing of the purchase agreement with Cougar Marine. It is also essential to recognize that Mr. Miller is an expert boat maker and a trained engineer. Also, Mr. Miller testified that he has been working with boats for over twenty years and is also a

---

6. Mr. Miller's Incomplete submission of printed electronic communications exchanged between the parties also had a significant influence on the Court's impression of Mr. Miller's credibility. Although Mr. Miller testified during the evidentiary hearing that the Court was given a complete record of the electronic communications between the parties, Mr. Miller excluded two unfavorable e-mails from his initial submission of printed communications. As a result, the Court questions the reliability of Mr. Miller's testimony.

sail maker. Surely, as a sophisticated boat and sail maker, Mr. Miller relied on his own expertise in deciding to enter into a contract for the purchase of a highly customized catamaran boat with Cougar Marine.

Moreover, the catamaran purchased by Mr. Miller was significantly different than the catamaran advertised by Defendants on the Internet. Therefore, Mr. Miller's claims of false advertisement and negligent misrepresentation are weak because the product Mr. Miller sought to purchase was not advertised by Defendants. In light of the foregoing, the Court concludes that the cause of action in this case does not arise out of the electronic communication between Mr. Miller and Mr. Berman.

Finally, Plaintiff alleges that specific personal jurisdiction exists over Defendants pursuant to section 48.193(1)(f). Clearly personal jurisdiction cannot be exerted over Defendants under section 48.193(1)(f) because Defendants did not engage in "solicitation or service activities within the state," nor have any "[p]roducts, materials, or things processed, serviced, or manufactured" by Defendants anywhere been used or consumed in the state of Florida. In sum, Defendants can not be subject to specific personal jurisdiction pursuant to Florida's long-arm statute.

In addition to his assertion of specific personal jurisdiction over Defendants, Mr. Miller claims that the court has general personal jurisdiction over Defendants pursuant to Florida's long-arm statute. "General jurisdiction over a foreign defendant" is conferred on Florida courts pursuant to section 48.193(2). Florida Statutes which provides:

A defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity.

"Unlike the provisions of section 48.193(1), section 48.193(2) does not require a nexus between the cause of action and the defendants' contacts with the state." *Northwestern Aircraft Capital Corp.*, 842 So.2d at 194 (internal citations omitted). In fact, general jurisdiction requires a more rigorous showing than specific jurisdiction. *Id.* "The courts have interpreted the language 'substantial and not isolated activity within the state' to mean that the defendant must be found to have maintained 'continuous and systematic general business contacts' with the forum state." *Id.* (quoting *Woods v. Nova Cos. Belize Ltd.*, 739 So.2d 617 (Fla. 4th DCA 1999)).

■ Mr. Miller alleges that while he was a resident of Florida he obtained information regarding catamaran sailboats on TMC's internet website and exchanged e-mails with Mr. Berman with regard to purchasing a sailboat. However, these allegations are insufficient to bring the action within the ambit of the statute relating to general jurisdiction because Defendants did not engage in activity within the state of Florida. TMC merely posts a passive website that allows Internet users to e-mail representatives of the company. Defendants do not solicit Florida residents or engage in business with Florida residents over the Internet. *Cf. Obermaier*, 208 F.Supp.2d at 1291 (holding that Texas-based organization was subject to general jurisdiction in Florida because it *solicited* contributions from Florida residents using Internet websites) (emphasis added).

It is evident that Defendants have not maintained continuous and systematic general business contacts with the state, and thus the Court concludes that Defendants conduct is insufficient to bring the action

within the ambit of Florida's long-arm statute relating to general jurisdiction.

B. *Even if jurisdiction were proper under Florida's long-arm statute, asserting personal jurisdiction over Defendants would violate the Due Process Clause.*

■ "In addition to satisfying the Florida long-arm statute, a federal court sitting in diversity must insure that jurisdiction comports with the due process requirements of the Fourteenth Amendment." *Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1270 (11th Cir.2002). "The federal courts also divide personal jurisdiction into the categories of specific and general. As to specific jurisdiction, the cause of action must arise out of, or be related to, the defendants' contacts with the state. This is not a requirement for general jurisdiction." *Northwestern Aircraft Capital Corp. v. Stewart*, 842 So.2d 190, 195 (Fla. 5th DCA 2003) (internal citations omitted)

"A Florida court obtains specific personal jurisdiction over a nonresident if the nonresident maintains 'certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' ' " *Northwestern Aircraft Capital Corp.*, 842 So.2d at 195 (quoting *Execu–Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.*, 752 So.2d 582 (Fla.2000)). "Adequate minimum contacts are established if the court finds that 'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Northwestern Aircraft Capital Corp.*, 842 So.2d at 195 (quoting *Glovegold Shipping, Ltd. v. Sveriges Angfartygs Assurans Forening*, 791 So.2d 4 (Fla. 1st DCA 2000)).

"Traditionally, when an entity intentionally reaches beyond its boundaries to conduct business with foreign residents, the

exercise of specific jurisdiction is proper. Different results should not be reached simply because business is conducted over the Internet." *Id.* at 1124. However, the law surrounding issues of jurisdiction and the internet has not fully developed, and the case law on this subject suggests that a Court must look at the nature of a website and the commercial activity actually being conducted over a website in order to determine whether personal jurisdiction can be constitutionally exercised. *See Zippo Mfg. Co. v. Zippo Dot Com. Inc.*, 952 F.Supp. 1119, 1124 (W.D.Pa.1997) (explaining that exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site).

For example,

[a]t one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. *A passive Web site that does little more than make information available to those who are interested in it is not grounds for personal jurisdiction.*

*Zippo*, 952 F.Supp. at 1124 (internal citations omitted) (emphasis added). In order to determine whether personal jurisdiction can be exerted over Defendants in this instance the Court must examine the nature of the interaction between Mr. Miller and Defendants over the Internet. Based on the information on the record, the Defendants did not conduct business over the

Internet, nor did Defendants solicit business over the Internet. Rather, it was Mr. Miller who contacted Defendants via e-mail after Mr. Miller came across Defendants' Informational website on the Internet.

The website at issue here is a passive one which merely makes information available to individuals who are interested in purchasing sailboats. Thus, the exercise of jurisdiction over Defendants in the State of Florida is not proper because placing an informational website on the Internet does not amount to sufficient contacts with the forum. To hold otherwise would undermine the policy behind the minimum contacts framework which seeks to protect defendants from being haled into court in a foreign jurisdiction based upon contacts that are random or attenuated. *Zippo*, 952 F.Supp. at 1123 (explaining that minimum contacts analysis protects defendants from being forced to answer for their actions into foreign jurisdictions based on random, fortuitous or attenuated contacts). Based upon the nature of the exchange between the parties over the Internet and the passive website, the Court concludes that Defendants did not purposefully direct business activities toward Florida, and therefore, jurisdiction in Florida would not comport with traditional notions of fair play and substantial justice.

"General personal jurisdiction, on the other hand, arises from a defendant's contacts with the forum that are unrelated to the cause of action being litigated. *The due process requirements for general personal jurisdiction are more stringent than for specific personal jurisdiction,* and require a showing of continuous and systematic general business contacts between the defendant and the forum state." *Consolidated Development Corp. v. Sherritt, Inc.,* 216 F.3d 1286, 1292 (11th Cir.2000) (emphasis added). The Defendants limited and sporadic connections with Florida are not the sort of general systematic business contacts constitutionally required to sustain an assertion of general personal jurisdiction.

C.  *Under 28 U.S.C. § 1391 venue is improper in the State of Florida.*

■ As a separate and independent ground for dismissal, Defendants argue that Mr. Miller's complaint should be dismissed pursuant to 28 U.S.C. § 1391 because venue is improper in the Middle District of Florida. This section states in pertinent part:

> (a) A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which the defendants are subject to personal jurisdiction at the time the action is commenced.

In response to Defendants' contention, Mr. Miller argues that venue is proper because "a substantial part of the events or omissions giving rise to the claim occurred" in Florida. However, in light of the facts set forth in the record, it is evident that venue is improper in Florida as this case arises out of Mr. Miller's contract with Cougar Marine, a South African company. The drafting and signing of the contract between Mr. Miller and Mr. Morrow occurred in South Africa. Mr. Miller's catamaran was being constructed in South Africa and Mr. Miller currently owns property and resides in South Africa. The fact that Mr. Miller obtained information from TMC's website and Mr. Berman while Mr. Miller was

residing in the state of Florida is insufficient to conclude that venue is proper in Florida. In light of the fact that Defendants reside in Pennsylvania and that the Court lacks personal jurisdiction over Defendants, this matter shall be transferred pursuant to 28 U.S.C. § 1406(a) to the Eastern District of Pennsylvania, where venue is proper.[7]

### III. *Conclusion*

Since Defendants have not established "minimum contacts" with Florida, the Court concludes that exerting personal jurisdiction over Defendants would not comport with traditional notions of fairly play and substantial justice as required by law. In addition, it is clear under the facts of this case that venue is improper in Florida.

In accordance with the foregoing it is **ORDERED** and **ADJUDGED** as follows:

1. Defendants' Motion to Dismiss or, in the Alternative, Transfer Venue (Doc. 5, filed March 24, 2003) is **GRANTED** only to the extent that the Court finds that the venue of this action should be transferred to the Eastern District of Pennsylvania.

2. The Clerk is directed to transfer this case to the United States District Court, Eastern District of Pennsylvania.

3. All other pending motions are **DENIED as moot.**

---

7. 28 U.S.C. § 1406(a) states:
(a) The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division which it could have been brought.